222 F.2d 184
 Joseph H. LYONS and Jessie H. Lyons, individually and as
co-partners doing business under the name and
style of Lyons Electrical Distributing
Company, Plaintiffs-Appellants,
v.
WESTINGHOUSE ELECTRIC CORPORATION and General Electric
Company, Defendants- Appellees.
Joseph H. LYONS and Jessie H. Lyons, individually and as
co-partners doing business under the name and
style of Lyons Electrical Distributing
Company, Petitioners,
v.
The Honorable Lawrence E. WALSH, United States District
Judge, Respondent.
 Docket 23312, 23325.
 United States Court of Appeals Second Circuit.
 Argued Jan. 3, 1955.
Decided March 29, 1955.
Rehearing Denied in No. 23325 April 25, 1955.
 
 John D. Calhoun and Albert R. Connolly, New York City, for the motion, and in opposition to the petition.
 Copal Mintz, New York City, opposed to the motion, and on behalf of the petition.
 Before L. HAND and MEDINA, Circuit Judges, DIMOCK, District Judge.
 L. HAND, Circuit Judge.
 
 
 1
 The defendant, Westinghouse Corporation, with the support of an affidavit of the General Electric Company, moves to dismiss an appeal taken by the plaintiff from an order, 16 F.R.D. 384, staying all further proceedings in the prosecution of the action at bar, pending the final determination of an action in the Supreme Court of New York brought by the Westinghouse Corporation against the plaintiffs. As an alternative, if the appeal is dismissed, the plaintiffs' petition for a writ of mandamus to direct Judge Walsh to vacate the same order. The complaint in the action at bar was in two counts, each for a separate claim. One of these was against the Westinghouse Corporation and the General Electric Company on a claim for damages arising out of a conspiracy in violation of the Anti-Trust Acts; the other was against the Westinghouse Corporation alone on a claim for damages for the violation of the Clayton, 15 U.S.C.A. § 12 et seq., and Robinson-Patman, 15 U.S.C.A. § 13 et seq., Acts. Before the plaintiffs brought the action the Westinghouse Corporation had sued them in the state court, demanding that they account for the breach of a contract made with it as its agents for the sale of electric lamps; to which as one of their defences the plaintiffs at bar pleaded that the Westinghouse and General Electric companies had entered into the same conspiracy to restrain competition in the marketing of such lamps. On October 6, 1953, the state court after a trial to a judge filed a decision, directing the plaintiffs to account as agents of the Westinghouse Corporation; in support of which among other matters it found that the 'defense of illegality, based upon violation of anti-trust laws, has neither been sustained nor established.' An interlocutory judgment was entered on this decision, 16 F.R.D. 384, from which the plaintiffs at bar have appealed, and the appeal is still pending.
 
 
 2
 The Westinghouse Corporation argues that the order on appeal was no more than 'a mere stay of proceedings which a court of law, as well as a court of equity, may grant in a cause pending before it by virtue of its inherent power to control the progress of the cause so as to maintain the orderly processes of justice';[1] and that, therefore, even though the federal action is at law, we should not treat the order as a substitute for a decree in equity enjoining its further prosecution. Judge Medina and Judge Dimock agree with this position and the motion to dismiss the appeal will therefore be granted. Although I should be personally disposed to hold that the order falls within the doctrine of Enelow v. New York Life Insurance Co., supra, 293 U.S. 379, 55 S.Ct. 310, Shanferoke Coal & Supply Corporation v. Westchester Service Corporation, 293 U.S. 449, 55 S.Ct. 313, 79 L.Ed. 583, and Ettelson v. Metropolitan Life Insurance Co., 317 U.S. 188, 63 S.Ct. 163, 87 L.Ed. 176, rather than within that of City of Morgantown v. Royal Insurance Co., Ltd., 337 U.S. 254, 69 S.Ct. 1067, 93 L.Ed. 1347, Baltimore Contractors v. Bodinger, 348 U.S. 176, 75 S.Ct. 249, and Mottolese v. Preston, 2 Cir., 172 F.2d 308, it does not seem to me that it would serve any purpose to set out my reasons, especially on a question which at best is open to so much debate. Hence the question arises whether the occasion is one in which it is proper to resort to mandamus. Our decisions in Mottolese v. Kaufman, 2 Cir., 176 F.2d 301, and P. Beiersdorf & Co., Inc., v. McGohey, 2 Cir., 187 F.2d 14, are controlling as to the propriety of this method of review; and, indeed, the situation presents a stronger reason for resorting to it than existed in either of those decisions. The merits of the claim here involved have been decided, and will go to final judgment as soon as the account has been judicially settled; when that happens the Westinghouse Corporation will be in a position to plead the judgment as an estoppel, and, if it is successful, that will dispose of the action at bar without a trial. It is true that the estoppel will not, literally speaking, end the jurisdiction of the district court; but it will do so in substance, if it is an estoppel at all, for it will conclude any further consideration of the existence of the conspiracy, and on that all else depends. For this reason we hold, quite aside from the two decisions just cited, that the question whether a final judgment will be an estoppel so nearly touches the jurisdiction of the district court, as to make it proper for us to entertain the petition for mandamus. Cf. Ex parte Wagner, 249 U.S. 465, 471, 39 S.Ct. 317, 63 L.Ed. 709.
 
 
 3
 The first defence which the plaintiffs at bar pleaded to the action in the state court was in seven separately numbered paragraphs, the first of which alleged that the Westinghouse Corporation, the General Electric Companies 'and others' were 'engaged in a mutual conspiracy together to monopolize the manufacture, distribution and sale of electric lamps in the United States.' The second paragraph alleged that, in pursuance of that conspiracy, the conspirators agreed not to 'sell electric lamps in the usual course of trade, but only through alleged 'agents' under their direction, control and surveillance;' and that the conspirators compelled the 'alleged 'agents' to observe uniform price schedules,' and prevented 'said alleged 'agents' from competing among each other.' The fourth paragraph alleged that the conspirators were successful in their purpose of establishing a monopoly; and the fifth, that 'by reason of the premises the defendants * * * were unable to purchase electric lamps in the ordinary and usual course of trade, and, in order to engage in their aforesaid business, were compelled to, and did, execute whatever agreements and papers the plaintiff, from time to time, prescribed or demanded, and they were compelled to, and did, comply with all other requirements specified by the plaintiff.' The sixth paragraph alleged that these 'agreements and transactions * * * were exacted by the plaintiff in furtherance and in execution of the aforesaid conspiracy and as an integral part of the carrying out thereof'; and the seventh, that 'by reason of the premises, the agreements and transactions alleged in the complaint were unlawful.' The complaint at bar alleged the existence of a conspiracy in so nearly identical terms that we need not repeat them; and its twelfth paragraph alleged that 'by reason thereof, it was impossible for plaintiffs profitably to engage in the business of selling electric lamps without having for sale and delivery electric lamps manufactured by the defendants * * * and to carry on such business most successfully and profitably, it was necessary to handle the lamps of both defendants.' The thirteenth paragraph then alleged that because of this situation 'the plaintiffs were compelled to enter into written contracts * * * as 'agents' at prices and upon terms fixed * * * pursuant to the conspiracy and * * * were limited to * * * selling * * * to persons designated or authorized * * * all * * * in pursuance of the conspiracy.' Further, that the contract, on which the Westinghouse Corporation sued in the state court, appointed the plaintiffs its 'agents' to sell lamps, consigned to it at prescribed prices and on prescribed terms (though they were to acquire no title to them), to account to the Corporation for the prices received, less commissions, to keep books of account and render periodical reports 'on forms provided by Westinghouse' and to remit the net proceeds of sales each month.
 
 
 4
 We think that the state court had undoubted jurisdiction, notwithstanding § 15 of Title 15, U.S.C.A., to decide the merits of the first defence, although it involved exactly the same claim as that pleaded in the first count of the action at bar. The extent to which conspiracies under the Anti-Trust Act invalidated transactions of the conspirators with third persons apparently arose for the first time in Connolly v. Union Sewer Pipe Co., 184 U.S. 540, 550-552, 22 S.Ct. 431, 46 L.Ed. 679, where the buyer pleaded such a defence to an action for the price of goods, and the Court unanimously overruled it. Soon thereafter, however, in Continental Wall Paper Company v. Louis Voight & Sons Co., 212 U.S. 227, 29 S.Ct. 280, 53 L.Ed. 486, it held by a five to four vote what the minority thought was the exact opposite and what with deference it is indeed hard to distinguish. Next came D. R. Wilder Manufacturing Co. v. Corn Products Refining Co., 236 U.S. 165, 35 S.Ct. 398, 59 L.Ed. 520, where the seller was allowed to recover for goods sold, as in Connolly v. Union Sewer Pipe Co., supra. The opinion, 236 U.S. at page 177, 35 S.Ct. at page 402, gave as an explanation of Continental Wall Paper Company v. Louis Voight & Sons, supra, that the following 'elements of illegality' had been there 'inhering' in the contract of sale: '(a) the relations of the contracting parties to the goods sold, (b) the want of real ownership in the seller, (c) the peculiar obligations which were imposed upon the buyer, and (d) the fact that to allow the nominal seller to enforce the payment of the price would have been, in and of itself, directly to sanction and give effect to a violation of the Anti-Trust Act inhering in the sale.' In Geddes v. Anaconda Copper Mining Co., 254 U.S. 590, 41 S.Ct. 209, 65 L.Ed. 425, the Court refused to allow a corporation to rescind the sale of its assets to another corporation on the ground that the sale had been in pursuance of a contract that violated the Anti-Trust Act; and in the course of the opinion, 254 U.S. at page 593, 41 S.Ct. at page 210, said that 'the remedies provided * * * for enforcing the rights created by it are exclusive.' In A. B. Small Co. v. Lamborn & Co., 267 U.S. 248, at page 252, 45 S.Ct. 300, at page 302, 69 L.Ed. 597, it overruled the defence to an action to recover the purchase price, because 'the contracts disclosed the full transaction * * * and contemplated that the sale should pass the title without any restriction on the right of the buyer to resell as it might choose. * * * It is only where the invalidity is inherent in the contract that the act may be interposed as a defense.' Finally, in Bruce's Juices v. American Can Co., 330 U.S. 743, at page 755, 67 S.Ct. 1015, at page 1020, 91 L.Ed. 1219, in overruling the buyer's defence to the seller's action to recover for goods sold at prices illegally discriminatory under the Robinson-Patman Act, the Court said of the Anti-Trust Act 'that where a suit is based upon an agreement * * * which has as its object and effect accomplishment of illegal ends which would be consummated by the judgment sought, the Court will entertain the defense that the contract in suit is illegal under the express provision of that statute. * * * But when the contract sued upon is not intrinsically illegal, the Court has refused to allow property to be obtained under a contract of sale without enforcing the duty to pay for it because of violations of the Sherman Act not inhering in the particular contract in suit.'
 
 
 5
 The upshot of these decisions, if we apprehend them right, is that, if the conspiracy inheres in the contract in suit by a conspirator against a non-conspirator, the conspiracy is a defence, but not otherwise. It is impossible to import any exact boundaries into that word; and we shall not attempt to do so; but, whatever may be its limits, it appears to us that, when a conspirator seeks to enforce a contract between himself and one of his 'agents,' whom he has employed to carry out the purposes of the illegal enterprise, the conspiracy must 'inhere' in the contract. The 'agent' is a cooperator with him in his illegal venture, unlike the buyer of the goods monopolized, who has not joined in the undertaking and is therefore not an abettor. The fact that the agent's cooperation is unwilling is irrelevant; although a victim of the wrong, he becomes an active promotor of it. Therefore, we think that the state court had jurisdiction to pass upon whether the defence, as alleged, was proved.
 
 
 6
 It does not, however, follow that final judgment in the state action when entered will be an estoppel in the case at bar. That would be true, we agree, except for § 15 of Title 15, U.S.C.A., because, although the finding that there was no conspiracy involved questions of law as well as questions of fact, it was nevertheless of a kind that courts treat as estoppels.[2] Thus the inquiry comes down to whether, when Congress gave exclusive jurisdiction to the district court over wrongs committed under the Anti-Trust Acts, it only meant that the 'person who shall be injured' must sue in the district court to recover damages; or whether it also meant that the district court must have unfettered power to decide the claim, regardless of the findings of any other courts, even when these were essential to the decision of actions over which their jurisdiction was unquestioned. A priori either reading seems permissible, and the decisions give an uncertain answer. The only case that we have discovered in the Supreme Court is Becher v. Contoure Laboratories, Inc., 279 U.S. 388, 49 S.Ct. 356, 73 L.Ed. 752. The action was by the patentee, Becher, for the infringement of his patent; and the defendant was the corporate assignee of the rights of one, Oppenheimer, who had recovered judgment against Becher in a state court, and whose claim had been that the information on which Becher procured the grant of his patent, he had got from Oppenheimer in a confidential relation. Oppenheimer's assignee pleaded the judgment of the state court as a defence, and it was held to be a good estoppel, although the consequence was to invalidate Becher's patent. The meat of the opinion is this, 279 U.S. at page 391, 49 S.Ct. at page 375: 'Again, even if the logical conclusion from the establishing of Oppenheimer's claim is that Becher's patent is void, that is not the effect of the judgment. Establishing a fact and giving a specific effect to it by judgment are quite distinct.' That looks as though the distinction were between the finding of one of the constituent facts that together make up a claim and the entire congeries of such facts, taken as a unit; an estoppel is good as to the first but not as to the second. It is possible to read § 71[3] of the Restatement of Judgments with such a limitation: that is to say if 'matter' be read as all the 'operative' facts that together make up a right. Comment (c) would also be consonant with this in saying that the finding of a state court, as a defence to an action on a note, that a patent given as its consideration was invalid, is not an estoppel in an action in a federal court brought upon the patent. There are decisions holding that findings in courts of testamentary jurisdiction will not be estoppels in actions in other courts;[4] on the other hand, the Third Circuit in United States v. Silliman, 167 F.2d 607, held that a finding of the Surrogate's Court of New York that there had been no fraud in a proceeding before it, was conclusive in an action in the district court. In Loomis v. Loomis, 288 N.Y. 222, 42 N.E.2d 495, 147 A.L.R. 183, the Court of Appeals decided that a finding by the 'Family Court'-- a division of an inferior court in New York City-- that the parties had been divorced did not operate as an estoppel in an action in the Supreme Court for a declaratory judgment that the divorce was void. On the other hand in Geracey, Inc., v. Hoover, 77 U.S.App.D.C. 55, 133 F.2d 25, 147 A.L.R. 185, a majority of the Court of Appeals for the District of Columbia held that the judgment of the Municipal Court of the District was an estoppel in an action in the District Court in the following situation. The defendant, a landlord, had sued the plaintiff, his tenant, in the Municipal Court to recover rent, and the plaintiff had pleaded as a set-off that the landlord had damaged his chattels in an amount greater than the Municipal Court's monetary jurisdiction. The Municipal Court dismissed tht set-off on the merits, and the Court of Appeals held the finding to be estoppel in an action by the tenant to recover damages in the full amount. Judge Rutledge dissented.
 
 
 7
 It is possible that decisions like Loomis v. Loomis, supra, 288 N.Y. 222, 42 N.E.2d 495 and Geracey, Inc., v. Hoover, supra, 77 U.S.App.D.C. 55, 133 F.2d 25 depended upon the relative authority of the court that made the findings compared with that of the court which tried the cause. That may also be the explanation of those decisions that refused to treat as conclusive the findings of a testamentary court; Judge Goodrich's careful analysis in United States v. Silliman, supra, 167 F.2d 607, of the powers and standing of the Surrogate's Court of New York, seems to presuppose such an interpretation. The traditional jealousy of all states of any attempt to adjudicate elsewhere interests in their real property, or in the matrimonial status of their own domiciliaries, is enough to account for those decisions. We are in accord with what Judge Goodrich says about the doctrine of res judicata in general, page 614: 'Such a rule of public policy must be watched in its application lest a blind adherence to it tend to defeat the even firmer established policy of giving every litigant a full and fair day in court.' In short, it appears to us that the doctrine, like so many others in the law, must be treated as a compromise between two conflicting interests: the convenience of avoiding a multiplicity of suits and the adequacy of the remedies afforded for conceded wrongs.
 
 
 8
 In the case at bar it appears to us that the grant to the district courts of exclusive jurisdiction over the action for treble damages should be taken to imply an immunity of their decisions from any prejudgment elsewhere; at least on occasions, like those at bar, where the putative estoppel includes the whole nexus of facts that makes up the wrong. The remedy provided is not solely civil; two thirds of the recovery is not remedial and inevitably presupposes a punitive purpose. It is like a qui tam action, except that the plaintiff keeps all the penalty, instead of sharing it with the sovereign. There are sound reasons for assuming that such recovery should not be subject to the determinations of state courts. It was part of the effort to prevent monopoly and restraints of commerce; and it was natural to wish it to be uniformly administered, being national in scope. Relief by certiorari would still exist, it is true; but that is a remedy burdensome to litigants and to the Supreme Court, already charged with enough. Obviously, an administration of the Acts, at once effective and uniform, would best be accomplished by an untrammeled jurisdiction of the federal courts.
 
 
 9
 Nor is there anything inconsistent with this in allowing violations of the Acts to be raised as valid defences to actions brought in state courts upon a claim against third persons, if it involves a partial enforcement of an undertaking itself forbidden. It is appropriate to the underlying purpose of the Acts that such claims shall not succeed, by compelling individuals on whom the wrong impinges to pay what is not due, even though they may later recover the amount three times over. For these reasons we think that the situation is one where the delay and expense of a double trial of the same issue, do not balance the importance of an uncommitted enforcement of the remedy provided in § 15.
 
 
 10
 As we have concluded that the district court has refused to proceed pending a final judgment of the state court that can have no effect upon the decision of the action at bar, we hold that its refusal was not authorized by law and that it is our duty, as it is within our power, to direct a writ of mandamus to go, ordering it to vacate the stay and to proceed in due course with the trial herein.
 
 
 11
 Appeal dismissed. Writ of mandamus to go thirty days after the filing of this opinion, directing the district court to vacate the stay in question, unless it has been vacated theretofore.
 
 
 12
 MEDINA, Circuit Judge (dissenting in part).
 
 
 13
 This opinion represents the views of a majority of the court as to the appealability of Judge Walsh's interlocutory order, and my own by way of dissent to what must be deemed the equivalent of the granting of petitioners' application for mandamus.
 
 The Stay
 
 14
 Thus the first question to be decided here is whether Judge Walsh's order is in substance the granting of an injunction, as it is beyond cavil interlocutory, and 28 U.S.C. §§ 1291 and 1292 give us jurisdiction only of appeals from 'final decisions' of the United States District Courts, and also of appeals from interlocutory orders 'granting, continuing, modifying, refusing or dissolving injunctions,' and others not pertinent to the matter before us.
 
 
 15
 It would be difficult to find a phase of the development of Anglo-American jurisprudence which has done so much to bedevil the whole machinery of justice as the distinction between law and equity, following in the wake of the establishment of the Court of Chancery in England. Despite unceasing efforts to abolish the distinction between the two, the old technicalities persist. Our decision here is controlled by a series of Supreme Court cases,[1] beginning with Enelow in 1935 and concluding with Baltimore Contractors in January, 1955. Judge Dimock and I construe those cases as a series of perfectly consistent efforts to inquire into the historical background and determine in each case whether or not the District Court, in granting or denying a 'stay' or striking a demand for a jury trial, was exercising a power such as the chancellor was, under the old or ancient practice, accustomed to call into play in a separate proceeding in equity. In other words, is the 'stay' a 'modern procedural substitute for a decree in chancery.' Wherever this was found to be the case, despite the merger of law and equity and the advent of the new Federal Rules of Civil Procedure, 28 U.S.C., the order was held to be injunctive in character and hence appealable under the statute, otherwise not. As the Supreme Court was construing statutory language long in effect, this historical approach seems to have been more or less inevitable, unless the Court, in search of a formula too simple to be misunderstood, had been willing to throw principle to the winds.
 
 
 16
 The first significant pronouncement upon the subject appeared in Enelow v. New York Life Ins. Co., 1935, 293 U.S. 379, 55 S.Ct. 310, 311, 79 L.Ed. 440. In that case, plaintiff brought an action at law in a state court upon a policy of life insurance. The case was removed to the federal court and defendant interposed the equitable defense of fraud in the procurement of the policy. When the District Court then granted defendant's petition to stay the action at law until the disposition of the issues raised by the equitable defense, plaintiff appealed and the Circuit Court of Appeals affirmed. 3 Cir., 70 F.2d 728. The Supreme Court addressed a portion of its opinion to the question of whether the appeal had been properly entertained and specifically indicated that the scope of the section which was the predecessor of Section 1292 was limited only to interlocutory orders 'which constitute an exercise of equitable jurisdiction in granting or refusing an injunction, as distinguished from a mere stay of proceedings which a court of law, as well as a court of equity, may grant in a cause pending before it by virtue of its inherent power to control the progress of the cause * * *.' The court went on to state that the power to stay proceedings in another court is peculiarly an equity power and that the grant or refusal by a court of equity of a stay of proceedings at law is a grant or refusal of an injunction within the meaning of the statute. This was specifically determined to be so even though both the suit in equity and the action at law were pending in the same court. Applying these rules to the case before it, the court concluded that in requiring the equitable defense to be tried first, the District Court had exercised an equity power to stay the proceeding at law just 'as if the court had acted upon a bill of complaint in a separate suit for the same purpose', and that the Circuit Court of Appeals therefore had jurisdiction over an appeal from the order.
 
 
 17
 On the same day, the Supreme Court decided Shanferoke Coal & Supply Corporation v. Westchester Service Corporation, 1935, 293 U.S. 449, 55 S.Ct. 313, 79 L.Ed. 583, and held that, in a breach of contract action, a special defense setting up an arbitration agreement was an equitable defense or cross bill and that a motion for a stay pending arbitration was an application for an interlocutory judgment based upon the special equitable defense. Consequently, citing Enelow, the District Court's denial of the motion was held to be appealable.
 
 
 18
 Next we come to Ettelson v. Metropolitan Ins. Co., 1942, 317 U.S. 188, 63 S.Ct. 163, 164, 87 L.Ed. 176, in which the Circuit Court of Appeals certified the question, whether, in an action at law in which the defendant files an equitable counterclaim, an order that the issue raised by the counterclaim should be heard and disposed of by the court prior to the issue raised by the complaint, is an order granting an injunction, for the purpose of determining the jurisdiction of the Circuit Court of Appeals to entertain an appeal. In holding the order appealable, despite the fact that the new Federal Rules of Civil Procedure had taken effect since the earlier decisions above discussed, the Supreme Court reaffirmed its holding in Enelow and stated that the plaintiffs were in the same position as if 'a state equity court had restrained them from a proceeding in the law action.'
 
 
 19
 Thus, in each of these three cases, appealability was limited to situations where the District Court exercised or refused to exercise its equity power to stay an original action at law in order first to determine the issues of a subsequently raised equitable defense or counterclaim.
 
 
 20
 The limited scope of appealability was further emphasized in City of Morgantown v. Royal Ins. Co., 1949, 337 U.S. 254, 69 S.Ct. 1067, 1069, 93 L.Ed. 1347. There, the original action was the equivalent of one in equity for reformation of a contract and defendant filed a legal counterclaim to recover under the contract and demanded a jury trial. Plaintiff moved to strike the demand and the District Court granted the motion. On plaintiff's motion, the Circuit Court of Appeals dismissed defendant's appeal from the lower court's ruling and the Supreme Court affirmed stating that this was 'not a situation where a 'chancellor' in denying a demand for jury trial can be said to be enjoining a 'judge' who has cognizance of a pending action at law.' 4 Cir., 169 F.2d 713. Since the case involved no exercise of an equity power to intervene in an action at law but merely an equity court regulating its own case, Morgantown fits more properly into the class of cases described in Enelow (239 U.S. 379, 55 S.Ct. 311) as 'a mere stay of proceedings which a court of law, as well as a court of equity, may grant in a cause pending before it by virtue of its inherent power to control the progress of the cause.' It is interesting to note that in deciding as it did the court said: 'Many interlocutory orders * * * may determine the outcome of the litigation, but they are not for that reason converted into injunctions.'
 
 
 21
 The last link in this chain is of very recent vintage. In Baltimore Contractors, Inc., v. Bodinger, 348 U.S. 176, 75 S.Ct. 249, decided January 10, 1955, the Supreme Court reaffirmed the criteria set forth in the earlier decisions previously discussed. There an equitable action for an accounting was brought in a state court and removed to the federal court by reason of diversity of citizenship. The defendant, claiming the issue to be referable to arbitration under an agreement between the parties, sought a stay of the original action pending arbitration under the provisions of the United States Arbitration Act. The District Court refused the stay and the Circuit Court dismissed defendant's appeal from the District Court's ruling. The Supreme Court, limiting the scope of appealability to the Enelow-Shanferoke-Ettelson kind of case and citing the Morgantown case as controlling, affirmed the Circuit Court's decision, and treated the District Court's action as an exercise of the power to stay steps within the framework of the litigation before a single court as distinguished from an injunction prohibiting proceedings in another court.
 
 
 22
 Thus, we are constrained to conclude from the foregoing that appealability exists in these cases only when there has been 'a stay through equitable principles of a common law action.'
 
 
 23
 In the case before us, Judge Walsh was not asked to exercise what was formerly an equity power to stay an action at law. True it is that this case is an original action at law, unlike both Morgantown and Baltimore Contractors, but the power exercised by Judge Walsh was simply the power to stay proceedings which 'a court of law, as well as a court of equity, may grant in a cause pending before it by virtue of its inherent power to control the progress of the cause * * *.' The exercise of an equity power which, under the Supreme Court rule, is an essential prerequisite to appealability is wholly absent.
 
 Mandamus
 
 24
 The factual background must first be explored before the principles, governing the question of whether or not we should entertain this petition for mandamus, can be applied. Dates and the sequence of events, together with the attendant circumstances disclosed by the record before us, led Judge Walsh to conclude that the stay should be issued in the interests of justice, not because he thought the District Court lacked jurisdiction to proceed.
 
 
 25
 On February 8, 1952, Westinghouse sued its former agents, partners doing business as Lyons Electrical Distributing Company, for an accounting in the New York Supreme Court, charging widespread fraudulent practices to conceal large sums of money due to Westinghouse. An answer was filed in due course; and, on June 20, 1952, an amended answer was served which asserted as a First Affirmative Defense that the agency contracts upon which Westinghouse sued were illegal under the Anti-trust Acts, by reason of a conspiracy charged against Westinghouse and General Electric. Shortly thereafter and on July 8, 1952, the present action was commenced in the United States District Court for the Southern District of New York. Judge Walsh quite correctly observes that this was 'an apparent retaliation'; and it is not disputed that the allegations of the defense in the state action and those of the complaint in this action are substantially identical.
 
 
 26
 The next move in the process of 'retaliation' appears to have been a motion in this action, based upon the identity of the anti-trust issues in the two actions, for an injunction restraining the prosecution of the action for the accounting, followed by the usual notices to take the depositions of a number of Westinghouse employees and subpoenas duces tecum requiring the production of vast quantities of documents, all in support of the anti-trust charge.
 
 
 27
 But Judge Bondy denied the motion for an injunction, and his order was unanimously affirmed by this court, 2 Cir., 1953, 201 F.2d 510 and the Supreme Court denied certiorari, 1953, 345 U.S. 923, 73 S.Ct. 781, 97 L.Ed. 1354. There were numerous moves and counter-moves relating to the discovery proceedings and the upshot was that some 800 pages of depositions were taken and some 6000 documents produced, pursuant to orders of the state court; and the state court action proceeded to trial. Judge Walsh comments dryly, that neither side 'pressed this action vigorously' and that 'twenty months have passed since the pre-trial order.'
 
 
 28
 Lyons was defeated on the merits, however, in the state court action; the proofs were found to have revealed shocking frauds, including the keeping of secret books, and the rendition of false monthly reports. The anti-trust charge, which had been the subject of much evidence pro and con at the trial, was also determined against Lyons on the merits.[2]
 
 
 29
 True to form, Lyons, after appealing to the Appellate Division of the New York Supreme Court from the interlocutory order directing the accounting, started in again with another round of deposition taking, with the usual subpoenas duces tecum requiring the production of documents. This led to the motion for a stay, which Judge Walsh granted in the exercise of his discretion, finding, under the peculiar circumstances which the affidavits portrayed, that there was a reasonable likelihood that the final determination of the accounting action would make unnecessary the expense and hardship of the discovery procedure which Lyons was bent on pursuing. It was not claimed that the interlocutory judgment in the state court had any binding effect; but Judge Walsh doubtless thought the 'retaliation' had gone far enough. And the congested condition of the court calendars in the Southern District of New York, and the added burden on the judges of supervising elaborate discovery proceedings in another anti-trust case, may well have been in his mind, even though the subject is not mentioned in his opinion. What is plain beyond argument is that the considerations which led him to grant the stay were such as are inherent in the making of interlocutory orders governing the administration of the dockets and the progress of cases prior to trial. There is nothing in the record before us to suggest that Judge Walsh lacked, or thought he lacked, power to decide the motion either way; nor does he purport to determine the question of whether the final judgment in the accounting action will have binding effect.
 
 
 30
 There is much talk nowadays on the subject of the law's delays, which are attributed to litigation arising out of the use of automobiles, the increase in the population, the complexity of modern life in an industrial age and the slowmoving processes by which improvements in the administration of justice are effected. But little is said about what is probably one of the principal causes of congestion of court calendars and delays which all too often result in the denial of justice. Our imposition of trivial costs on the defeated party, which makes our courts open to all, whether rich or poor, and our elaborate and justly praised discovery procedures, make our courts a happy hunting ground, where irresponsible people may make irresponsible and wholly unfounded offensive and defensive claims with impunity, in the hope that payments will be made for what is euphemistically phemistically called 'nuisance value,' or that the day of reckoning may be postponed and exhausted and impoverished suitors be induced to abandon just causes from lack of the wherewithal to continue to prosecute them. The existence of separate state and federal court systems multiplies the opportunities for artful maneuvers and procedural sallies which serve little purpose other than to throw sand in the judicial machinery. And it is difficult for me to avoid the conclusion that the ruling about to be made here will aid those who may wish to subvert justice by ingenious devices, by taking away from the District Judges what is one of their most useful incidental powers, that of regulating their calendars and the progress of causes before trial, in the interest of substantial justice.
 
 
 31
 My brethren say that 'a final judgment of the state court * * * can have no effect upon the decision of the action at bar'. I do not see how that can be so.[3] But even if a final judgment in the state court, on these very issues of law and fact, were not binding, I still say there is no basis on this record for holding that Judge Walsh abused his discretion in granting the stay. Mere abstractions and hypotheses should not be permitted to render our District Judges powerless to deal with practical every day problems, such as the one with which Judge Walsh was called upon to deal. If permitted to run the gamut of discovery procedure against both Westinghouse and General Electric, while the Appellate Division is disposing of the appeal from the interlocutory judgment and, in case of affirmance, pending the settlement of the account and an appeal to the Court of Appeals, these two companies will doubtless be able to endure the expense and the disruption of their administrative and executive staffs, while the various officers and employees are running around answering questions and producing documents. Perhaps they will settle or withdraw the state action; but either eventuality seems remote. In the end, if the New York Court of Appeals affirms a final judgment against Lyons, rejecting on the merits the claims of Lyons on the anti-trust issues as well as the others, the trial of this action some years from now may proceed nevertheless when it is reached in due course; but I doubt it. In any event, other litigants under similar pressures in other cases may not be able to afford the expense of defending themselves against such procedural warfare indefinitely, and the rule of this case will, at least in this Circuit, leave District Judges no alternative other than to withhold the only remedy which will meet the necessities and practicalities of the case.
 
 
 32
 I think the writ should be withheld, even if we may be said to have the power to let it go in aid of our appellate jurisdiction, which I do not concede. See Radio Corporation of America v. Igoe, 7 Cir., 1954, 217 F.2d 218, certiorari denied 75 S.Ct. 533.
 
 
 33
 DIMOCK, District Judge, concurs in that part of Circuit Judge MEDINA'S opinion entitled 'The Stay'.
 
 On Petition for Rehearing in No. 23325
 
 34
 We do not find it necessary to discuss this petition except as to three decisions that the defendants press upon us as contrary to what we held about the collateral estoppel of the state judgment if it becomes final. These decisions are Straus v. American Publishers' Association, 2 Cir., 1912, 201 F. 306; Singer v. A. Hollander & Son, 3 Cir., 1953, 202 F.2d 55; Partmer Corporation v. Paramount Pictures Theatres Corporation, 1954, 347 U.S. 89, 74 S.Ct. 414, 98 L.Ed. 532. We take them up in their order.
 
 
 35
 In the first the plaintiffs had recovered a money judgment in a state court under a state statute against monopolies and restraint of trade. Later they sued the same defendants and others under the Sherman Act in a federal court for treble damages, and we affirmed a judgment of Lacombe, J., that dismissed the complaint because the 'plaintiffs, having the option to go into either court, chose the state court, and their claim, having been there adjudicated, cannot be presented the second time to any other court.' (201 F. 310) Although it was not then entirely certain that § 15 of Title 15-- which had been in the original Sherman Act as § 7-- made the jurisdiction of the federal courts exclusive over actions for damages for violation of the Anti-Trust Acts, we apparently thought that it did, for we said that 'the complaint in this case is founded on the federal statute, which is not within the jurisdiction of the state court'. We must therefore have meant to hold that the judgment of the state court, so far as it dismissed the claim as to uncopyrighted books, was a bar to the claim created by § 15. That was much more than a holding that the findings of a state court constitute an estoppel in a federal court; nevertheless we will assume arguendo that it would have been correct, had § 15 not made the jurisdiction of the federal courts exclusive over claims arising under the Anti-Trust Act; for it is apparently true that judgment upon the same set of facts is a merger or a bar in another action, even though the legal liability in the first was different from that in the second.[1] However, we cannot see how the jurisdiction over a claim arising under § 15 can be exclusive, if the decision of a state court upon that very claim is to be deemed a bar to an action on it in a federal court; yet that was precisely the effect of our decision in the case in question. Our decision is now over forty years old, and no other case, so far as we can find, has ever relied upon the ruling. With all deference we cannot regard it as a valid precedent.
 
 
 36
 The second case concerned an action in a federal court by an employee against his employer to have the contract between them declared invalid on the ground that it had been part of the execution of a conspiracy in violation of the Anti-Trust Acts. The employer had sued the plaintiff in a state court upon the same contract, and the plaintiff had set up as a defence that the contract was in restraint of trade. The state appellate court gave judgment for the employer overruling the defence, and finding that the plaintiff had been guilty of many unconscionable violations of the contract. The Third Circuit held that the findings of the state court as to the plaintiff's misconduct were estoppels in the federal action, and that, as such, they disqualified him from filing a suit in equity in the federal court to have the contract declared invalid. It follows that the point decided had nothing to do with the effect of the judgment of a state court upon any claim or cause of action of the plaintiff to recover damages for violation of the Anti-Trust Acts.
 
 
 37
 In the third case the Paramount Corporation had sued the Partmar Corporation in ejectment in the District Court for the Southern District of California, and the Partmar Corporation pleaded as counterclaims claims for damages for violations of the Anti-Trust Acts. The court separated the counterclaims for trial and treated them thereafter as though they were separate actions. The Paramount Corporation based the action of ejectment on the theory that the lease under which the Partmar Corporation held possession had been executed under a 'franchise' which the District Court for the Southern District of New York had then held to be violation of the Anti-Trust Trust Acts. However, the Supreme Court reversed this ruling of that court before the ejectment action came on for trial in California; and the trial court found that the Paramount Corporation had not entered into any conspiracy that included the execution of the lease, and dismissed the action of ejectment. It also dismissed the counterclaims relying upon its findings in the ejectment action as estoppels. It is enough to distinguish the decision of the Supreme Court affirming this judgment that, even though the decision of the court in the ejectment action could be regarded as disposing of a liability under § 15, it was the judgment of a federal court that had jurisdiction over an action for damages under that section.
 
 
 38
 So it appears to both Judge Dimock and me that none of these decisions throws any doubt upon our opinion already filed. But I go further, though he does not, because I think it necessary to distinguish the situation from that in Becher v. Contoure Laboratories, 279 U.S. 388, 49 S.Ct. 356, 73 L.Ed. 752, which we mentioned in our opinion. That decision, to say nothing of our own which it affirmed, would, I believe, make the specific findings of fact of the state court, had there been any, estoppels in this action, even though the result were to put an end to the plaintiffs' claim. I concede that in effect this means that the exclusive jurisdiction of the federal court under 15 may be imparied by a state judgment; and that the immunity which that section grants is limited to judgments of state courts that except for that immunity would be bars or mergers. I cannot read Becher v. Contoure Laboratories, supra, in any other way; but the judgment of the state court here disposed of the plaintiffs' claim in just the sense that the immunity covers, if so limited. On the other hand the findings in Singer v. A. Hollander & Son, supra, were not of that kind; nor were those in Partmar Corporation v. Paramount Pictures Theatres Corporation, supra, 347 U.S. 89, at pages 100, 101, 74 S.Ct. 414, at page 421; as appears from the following passage in the opinion: 'Neither the lease nor the franchise was the result 'of any agreement, combination or conspiracy of any kind whatsoever.' * * * This finding * * * determined the key ingredient of Partmar's counterclaims contrary to its allegations and thus precluded recovery upon such claims * * * the judgment entered on the complaint was a final disposition of the determinative issue on the counterclaims-- whether or not the terms of the lease were a product of an illegal conspiracy.'
 
 
 39
 The petition is denied.
 
 
 
 [1]
 Enelow v. New York Life Insurance Co., 293 U.S. 379, 381, 382, 55 S.Ct. 310, 311, 79 L.Ed. 440
 
 
 [2]
 United States v. Moser, 266 U.S. 236, 242, 45 S.Ct. 66, 69 L.Ed. 262; Emich Motors Corp. v. General Motors Corp., 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534; Partmar Corp. v. Paramount Pictures Theatres Corp., 347 U.S. 89, 102, 103, 74 S.Ct. 414, 98 L.Ed. 532
 
 
 [3]
 'Where a court has incidentally determined a matter which it would have had no jurisdiction to determine in an action brought directly to determine it, the judgment is not conclusive in a subsequent action brought to determine the matter directly.'
 
 
 [4]
 Clark v. Dew, 1 Russ. & Milne 103; Bogardus v. Clarke, 1 Edw.ch. 266, affirmed 4 Paige 623
 
 
 [1]
 Enelow v. New York Life Ins. Co., 1935, 293 U.S. 379, 55 S.Ct. 310, 79 L.Ed. 440; Shanferoke Coal & Supply Corporation v. Westchester Service Corporation, 1935, 293 U.S. 449, 55 S.Ct. 313, 79 L.Ed. 583; Ettelson v. Metropolitan Ins. Co., 1942, 317 U.S. 188, 63 S.Ct. 163, 87 L.Ed. 176; City of Morgantown v. Royal Ins. Co., 1949, 337 U.S. 254, 69 S.Ct. 1067, 93 L.Ed. 1347; Baltimore Contractors, Inc., v. Bodinger, 1955, 348 U.S. 176, 75 S.Ct. 249
 
 
 [2]
 Westinghouse Electric Corporation v. Lyons, Sup.Ct., N.Y.County, 1953, 125 N.Y.S.2d 420
 
 
 [3]
 'The general principle announced in numerous cases is that a right, question, or fact distinctly put in issue, and directly determined by a court of competent jurisdiction, as a ground of recovery, cannot be disputed in a subsequent suit between the same parties or their privies; and, even if the second suit is for a different cause of action, the right, question, or fact once so determined must, as between the same parties or their privies, be taken as conclusively established, so long as the judgment in the first suit remains unmodified.' Southern Pacific R. Co. v. United States, 1897, 168 U.S. 1, 48, 18 S.Ct. 18, 27, 42 L.Ed. 355; to the same effect Partmar Corp. v. Paramount Pictures Theatres Corp., 1954, 347 U.S. 89, 74 S.Ct. 414, 98 L.Ed. 532; Becher v. Contoure Laboratories, Inc., 1929, 279 U.S. 388, 49 S.Ct. 356, 73 L.Ed. 752; United States v. Moser, 1924, 266 U.S. 236, 45 S.Ct. 66, 69 L.Ed. 262. The quotation from the Becher case appearing in the majority opinion relates to the distinction between the competency of the state court to decide issues properly before it and its competency to declare a patent invalid. The Supreme Court indicated only that, as to the first, the state court was competent and its decision conclusive on the federal court even though it would not have had the power to render a judgment declaring the patent invalid. So here it would seem clear that the state court's decision of the anti-trust issue properly before it would be conclusive although undeniably it would not have had the power to entertain a treble damage action
 
 
 [1]
 Troxell v. Delaware, Lackawanna & Western R. Co., 227 U.S. 434, 33 S.Ct. 274, 57 L.Ed. 586; Baltimore S.S. Co. v. Phillips, 274 U.S. 316, 47 S.Ct. 600, 71 L.Ed. 1069