JANEL SALES CORP., Plaintiff-Appellant,

v.

LANVIN PARFUMS, INC. by change of name Lanvin-Charles of the Ritz, Inc., Defendant-Appellee.

CARLTON DRUG, INC., Plaintiff-Appellant,

v.

LANVIN PARFUMS, INC. by change of name Lanvin-Charles of the Ritz, Inc., Defendant-Appellee.

No. 393, Docket 31852.

United States Court of Appeals Second Circuit.

Argued April 5, 1968.

Decided June 5, 1968.

Certiorari Denied Nov. 12, 1968.

See 89 S.Ct. 303.

Morris Siegel, New York City, for plaintiffs-appellants.

MacDonald Flinn, New York City (White & Case, Thomas McGanney, and Fred Greene, New York City, of counsel), for defendant-appellee.

Before MOORE, WOODBURY * and SMITH, Circuit Judges.

MOORE, Circuit Judge:

Defendant-appellee, Lanvin Parfums, Inc., by change of name Lanvin-Charles of the Ritz, Inc. (hereinafter Lanvin), produces, imports and sells fragrances and other cosmetics. During the years in question here, it had only two places of business, an office in New York City, and an office, warehouse and factory in Long Island City, New York. It averaged about $17,000,000 in national sales annually and about $3,000,000 in New York sales.

All of its sales were made at 40% off its recommended list price or, in States which had fair trade laws, at 40% off the fixed resale price. Most of its sales

* Of the First Circuit, sitting by designation.

were made directly to retail dealers. However, the trial judge found that annually approximately $85,000 of the total sales were "accommodation" sales to employees, to firms which did business with Lanvin for their employees (e. g., Bankers Trust), to employees of firms which dealt with Lanvin (e. g., Parents Magazine) and to persons who serviced Lanvin (e. g., the Pepsi-Cola delivery man). Approximately another $93,000 of its annual New York sales were termed "promotional" by the Court. Usually in larger quantities, these sales were either for the promotion of Lanvin and its customer together (e. g., American Airlines) or primarily for the customer's own promotional campaign (e. g., Paragon Containers). Most of these promotion sales were for the customer's own campaign. However, in both cases, the purchaser had to have had some prior business dealings with Lanvin (e. g., Paragon supplied it with containers).

Prior to the bringing of this suit, Lanvin had entered into fair trade agreements with several retailers in New York.[1] The standard contract provided, *inter alia*, that:

(1) "Retailer" will not (except as specifically permitted by said Fair Trade Act) directly or indirectly advertise, offer for sale, or sell any of such "Commodities" in said State at less than the minimum retail prices stipulated therefor by "Manufacturer."

\* \* \* \* \* \*

(6) "Retailer" will not, where statute or law permits such restriction, sell any of the "Commodities" except to consumers for use.

Lanvin diligently enforced clause (1). The evidence is conflicting as to how insistently it enforced clause (6), if it enforced that provision at all.

Janel Sales Corp. and Carlton Drug, Inc. (hereinafter plaintiffs) are large discount drug stores in New York City. Together they averaged approximately $650,000 in annual sales, roughly 7% of which was the cosmetic field. They were not direct accounts of Lanvin and they were non-signers to the resale price maintenance contract; nevertheless, they acquired (by diversion from other retail stores) Lanvin's products and sold them at a slight discount.

Most of their sales were to individuals; in some instances, they sold to the same people who bought perfume from Lanvin at 40% off the fair trade price. Plaintiffs also sold cosmetics in bulk to various firms for gifts and promotional campaigns. Usually these businesses were in the neighborhood. Lanvin also sold its products to several businesses in plaintiffs' vicinity, including one company in plaintiffs' building (e. g., Pop's Textiles). These sales were for promotional campaigns and Lanvin made them

---

1. New York General Business Laws, McKinney's Consol.Laws, c. 20, §§ 369–a(1) and 369–b:

§ 369–a.

1. No contract relating to the sale or resale of a commodity which bears, or the label or content of which bears, the trade mark, brand, or name or the producer or owner of such commodity and which is in fair and open competition with commodities of the same general class produced by others shall be deemed in violation of any law of the state of New York by reason of any of the following provisions which may be contained in such contracts:

(a) That the buyer will not resell such commodity except at the price stipulated by the vendor;

(b) That the vendee or producer require any dealer to whom he may resell such commodity to agree that he will not, in turn, resell except at the price stipulated by such vendor or by such vendee.

§ 369–b.

Wilfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provision of section three hundred sixty-nine-a, whether the person so advertising, offering for sale or selling is or is not a party to such contract, is unfair competition and is actionable at the suit of any person damaged thereby.

at 40% off the fixed resale price. Nevertheless, Lanvin sought to enjoin plaintiffs from selling Lanvin perfumes to any of these customers at a price below the stipulated fair trade price. The New York court issued the injunction. Lanvin Parfums, Inc. v. Carlton Drug, Inc., 1962 Trade Cases ¶70,563 (N.Y. Sup.Ct.); Lanvin Parfums, Inc. v. Carlton Drug, Inc., 1963 Trade Cases ¶ 70,645 (N.Y. Sup.Ct.) aff'd 24 A.D.2d 935, 264 N.Y.S.2d 212 (1965).

Plaintiffs brought this action (before Court and jury) for treble damages[2] and for injunctive relief, 15 U.S. C. §§ 15, 26, based on Lanvin's alleged violation of the Sherman Act, 15 U.S. C. § 1. The district judge correctly ruled that the New York State decisions enjoining plaintiffs are not binding on the federal court, Lyons v. Westinghouse Electric Corp., 222 F.2d 184 (2 Cir.), cert. den. 350 U.S. 825, 76 S.Ct. 52, 100 L.Ed. 737 (1955). Furthermore, he correctly recognized that whatever reach the New York courts might give the New York Fair Trade Laws, such decisions are subject to McGuire Act[3] limitations. Sunbeam Corp. v. Masters, Inc., 157 F.Supp. 689, 691 (S.D.N.Y. 1957). Nevertheless, in our opinion he incorrectly ruled (1) that Lanvin was not a "retailer" as a matter of law, and even if it were, the quantity of accommodation-retail sales was *de minimis* and (2) that as a matter of law the amount of competition between Lanvin and plaintiffs was irrelevant.

Therefore, he erred in directing a verdict on these two points.

---

2. Of course, there can be no damages arising from the state court injunction, even if the issuance of it was in error. Plaintiffs' remedy for an erroneous state court decision rests in the state courts. See Di Gaetano v. Texas Co., 300 F.2d 895 (3 Cir. 1962); Fiumara v. Texaco Inc., 204 F.Supp. 544 (E.D.Pa.), aff'd 310 F.2d 737 (3 Cir. 1962).

3. 66 Stat. 631 (1952), 15 U.S.C. §§ 45(a) (1)–(a) (5):

(a) (1) Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful.

(2) Nothing contained in this section or in any of the Antitrust Acts shall render unlawful any contracts or agreements prescribing minimum or stipulated prices, or requiring a vendee to enter into contracts or agreements prescribing minimum or stipulated prices, for the resale of a commodity which bears, or the label or container of which bears, the trade-mark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others, when contracts or agreements of that description are lawful as applied to intrastate transactions under any statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia in which such resale is to be made, or to which the commodity is to be transported for such resale.

(3) Nothing contained in this section or in any of the Antitrust Acts shall render unlawful the exercise or the enforcement of any right or right of action created by any statute, law or public policy now or hereafter in effect in any State, Territory, or the District of Columbia, which in substance provides that willfully and knowingly advertising, offering for sale, or selling any commodity at less than the price or prices prescribed in such contracts or agreements whether the person so advertising, offering for sale, or selling is or is not a party to such a contract or agreement, is unfair competition and is actionable at the suit of any person damaged thereby.

(4) Neither the making of contracts or agreements as described in paragraph (2) of this subsection, nor the exercise or enforcement or any right or right of action as described in paragraph (3) of this subsection shall constitute an unlawful burden or restraint upon, or interference with, commerce.

(5) Nothing contained in paragraph (2) of this subsection shall make lawful contracts or agreements providing for the establishment or maintenance of minimum or stipulated resale prices on any commodity referred to in paragraph (2) of this subsection, between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms, or corporations in competition with each other.

## I.

■ Price maintenance agreements are *per se* violations of the Sherman Act § 1. This is true for horizontal contracts, as, for example, where two competing manufacturers contract not to sell below a specified price, United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); it is also true for vertical agreements, as, for example, when a retailer of a specified product agrees with the manufacturer of the product not to sell it below a specified price. Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911). However, such agreements, otherwise *per se* violations of the antitrust laws, may be immunized by federal statute. See United States v. McKesson & Robbins, Inc., 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956). And the Miller-Tydings Act[4] was Congress' first immunizing statute in this area. In amending the Sherman Act § 1, this Act provided for legal resale price maintenance in states in which such vertical contracts were allowed, providing, however, that the prior prohibition on *per se* horizontal agreements would be retained.[5] But in Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 71 S.Ct. 745, 95 L. Ed. 1035 (1951), the Supreme Court held that this Act did not permit a producer to enforce a resale price maintenance contract against nonsigning retailers. In that Court's opinion, not only was such an interpretation not intended by Congress, but it would also be "price-fixing by compulsion."

Congress reacted to the *Schwegmann* case with the McGuire Act. It was passed as an amendment to the Federal Trade Commission Act,[6] and its primary purpose was to reverse the limiting features of the *Schwegmann* decision. The Report of the House Committee on Interstate Commerce, which accompanied the McGuire Act, declared that:

"The primary purpose of the bill is to reaffirm the very same proposition which, in the committee's opinion, the Congress intended to enact into law when it passed the Miller-Tydings Act * * *, to the effect that the application and enforcement of State fair-trade laws—including the nonsigner provisions of such laws—with regard to interstate transactions shall not constitute a violation of the Federal Trade Commission Act or the Sherman Antitrust Act. This reaffirmation is made necessary because of the decision of a divided Supreme Court in Schwegmann v. Calvert Distillers Corporation (341 U.S. 384 [71 S.Ct. 745, 95 L.Ed. 1035] May 21, 1951). In that case, six members of the Court held that the Miller-Tydings Act did not exempt from these Federal laws enforcement of State fair trade laws with respect to nonsigners. Three members of the Court held that the Miller-Tydings Act did so apply."

Paragraphs (3) and (4) were newly added (paragraphs (2) and (5) were almost identical to the Miller-Tydings Act) to provide that if the State statutory scheme permitted price maintenance against nonsigners, such contracts would be immunized from antitrust violations. It was clear, however, that Congress purported to do no more. It did not intend to immunize additional horizontal arrangements. United States v. McKesson & Robbins, Inc., supra, 351 U.S. at 310–311, 76 S.Ct. 937. Paragraph (5) of the McGuire Act, as with

---

4. 50 Stat. 693 (1937), 15 U.S.C. § 1.

5. " * * * That the preceding proviso shall not make lawful any contract or agreement, providing for the establishment or maintenance of minimum resale prices on any commodity herein involved, between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms, or corporations in competition with each other." 15 U.S.C. § 1.

6. 38 Stat. 711 (1914).

the Miller-Tydings Act before, explicity excepted contracts which fixed prices on a horizontal level.

"(5) Nothing contained in paragraph (2) of this subsection shall make lawful contracts or agreements providing for the establishment or maintenance of minimum or stipulated resale prices on any commodity referred to in paragraph (2) of this subsection, between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms, or corporations in competition with each other."

The legal issues in this case revolve about the proper interpretation of this exception paragraph.

## II.

█ It is arguable that if the phrase "in competition with each other" modifies "retailers," there must be a showing, as there was not in this case, of some quantum of competition between the signing retailers and the manufacturer-retailer before the contract falls within the scope of paragraph (5). As a point of grammar, this interpretation is possible. However, even though the Supreme Court did not find it necessary to answer this question, see United States v. McKesson & Robbins, Inc., supra, the legislative history supports the conclusion that it is immaterial whether a manufacturer-retailer and a signing retailer are in actual competition.[7] As Senator Tydings, the author of the proviso, said:

" * * * The amendment provides that nothing in this particular provision shall permit manufacturers to combine with manufacturers, wholesalers with wholesalers, factors with factors, or retailers with retailers. This is made absolutely certain. I do not think it was necessary, but I was glad to put into place the matter beyond the peradventure of a doubt." 81 Cong.Rec. 7496.

If two retailers sign a price maintenance contract, regardles of whether they are competitors, then the contract is within paragraph (5) and, therefore, excluded from McGuire Act immunization from the Sherman Act. Johnson & Johnson v. Avenue Merchandise Corp., 193 F.Supp. 282 (S.D.N.Y. 1961).

█ Thus, the first question of fact is whether Lanvin is functionally a retailer. The district court held as a matter of law that none of the accommodation sales were retail sales. It said:

"[A]s a matter of human nature all manufacturers could be expected to follow this practice, and that they do so would not change their status from a manufacturer to that of a retailer."

Moreover, it found that even if the total of accommodation sales were at retail, the volume would be too insignificant to make Lanvin a retailer.

█ The term "retailer" is to be understood in its normal and customary manner. United States v. McKesson & Robbins, Inc., supra at 388, 76 S.Ct. 937. Indicia of a retail sale are the actual size of the sale, the dollar value of the sale, and the number of similar sales that are made. However, the principal focus must be whether " * * * the purchaser is actuated solely by a desire to satisfy his own personal wants or those of his family or friends through the personal use of the commodity * * * purchased." Roland Electric Co. v. Walling, 326 U.S. 657, 674, 66 S.Ct. 413, 421, 90 L.Ed. 383; Parke, Davis & Co. v. Janel Sales Corp., 328 F.2d 105, 106 (2 Cir.), cert. denied, 379 U.S. 835, 85 S.Ct. 67, 13 L.Ed.2d 42 (1964).

█ Nevertheless, it seems only common sense to exclude legitimate accommodation sales to employees from this general definition. These sales are merely incidental and accessory. General Electric Co. v. Kimball Jewelers, 333 Mass. 665, 132 N.E.2d 652, 657 (1956); General Electric Co. v. Hess Brothers, Inc., 155 F. Supp. 57, 62 (E.

7. Debate on HR 5767, 82nd Cong., 2d Sess., 1952.

D.Pa.1957). However, as the sales spectrum broadens, the alleged accommodation sales may become a subterfuge for retail selling. For example, are sales to typewriter repairmen and Pepsi-Cola delivery men truly akin to employee accommodation sales in this case? And in what niche do Lanvin's sales to its attorneys fall? Are all these sales merely incidental and accessory? At some point, and this is a question of fact, these allegedly incidental "accommodation" sales may become true retail sales. And since reasonable men may differ as to the precise spot along the spectrum where the distinguishing line should be placed, the jury should have an opportunity to draw it. Reasonable men may also differ as to what quantum of retail sales is necessary to change the status of a producer to a functional retailer. Certainly $1 would be *de minimis*. But this is a case involving tens of thousands of dollars worth of accommodation sales. Again, the jury should have the opportunity to determine where the line is best drawn. If it is found, as a matter of fact, that Lanvin is a retailer, the resale price maintenance contract falls within paragraph (5) of the McGuire Act and the contract loses its statutory immunization.

### III.

However, even if Lanvin is not considered a retailer, the contract will still violate the Sherman Act if it provides for resale price maintenance between competitors, regardless of whether these competitors are signatories to the contract. Lanvin disagrees.

First, Lanvin contends that the paragraph (5) exclusion was intended to exclude resale price contracts only in situations in which the signing parties are competitors. Primary reliance is placed on language in United States v. McKesson & Robbins, Inc., supra, 351 Mass. at 313, 76 S.Ct. 937, 942, in which the Supreme Court, in striking down a wholesaler's resale price agreement with competing, signing wholesalers, said:

"Congress thus made as plain as words can make it that, without regard to catalogues or labels, the crucial inquiry is whether the contracting parties compete with each other."

However, the Court was concerned with competing signers. From the whole opinion, it is clear that the Supreme Court was principally interested in horizontal competition. See G.E.M. Sundries Co. v. Johnson & Johnson, Inc., 283 F.2d 86, 92 (9 Cir. 1960).

Second, Lanvin relies on the statutory construction of paragraph (5) espoused in Johnson & Johnson v. Janel Sales Corp., 192 F.Supp. 780 (S.D.N.Y. 1961). In that case, the court observed that paragraph (5) referred specifically, and only, to paragraph (2)—which protects fair trade contracts. On the other hand, paragraph (4) referred to both paragraphs (2) and (3). Therefore, it reasoned, paragraph (5) only exempts paragraph (2) contracts between competing parties from the McGuire Act immunization.

The court recognized, however, that such an interpretation opened a wide loophole. A producer might enter into a single resale price maintenance contract with a retailer. As long as the producer itself did not become a retailer in fact, it could enforce this fixed price against all sellers of its product, even though they might be competitors for commercial accounts or bulk sales. A producer might go further and attempt to hold the bulk sales competitor to the fair trade price while at the same time setting his own price below that level.[8] This is what allegedly happened in this case. The court thought, however, that a "surgical operation too serious for the judiciary to perform" would be necessary to close the loophole.

We do not believe that the statutory language is so compelling. Underlying the court's reasoning is the assumption that the phrase "in competition with

---

8. Case comment, 75 Harv.L.Rev. 842 (1962).

each other" refers to the parties who sign the "contracts or agreements." It is possible that the phrase refers to those parties for whom the resale "prices" are stipulated. If this interpretation were accepted, paragraph (5) would still exclude only paragraph (2) contracts, but the issue would be whether these contracts provided for the establishment of prices between competitors.[9]

The legislative history is not very helpful on this point. However, in passing the McGuire Act, Congress' principal purpose was to reverse the *Schwegmann* decision. That case had prohibited a producer from enforcing his price maintenance contract against nonsigning, noncompeting (with it) retailers. There is no indication that Congress intended to do more; in fact, there was constant concern with horizontal price fixing, either by agreement or compulsion.

Esso Standard Oil Co. v. Secatore's Inc., 246 F.2d 17 (1 Cir.), cert. denied 355 U.S. 834, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957) supports our interpretation. In that case, Esso was denied an injunction against a nonsigning service station which sold to commercial accounts, for Esso also sold to commercial accounts. Therefore, since Esso and Secatore's were "corporations in competition with each other," the resale price maintenance contract entered into between Esso and other retailers could not support an injunction. The concurring opinion makes it clear that the crucial fact for the majority was that Esso and the nonsigning Secatore's were competitors. Accord, Texas Co. v. Di Gaetano, 39 N.J. 120, 187 A.2d 721 (1963); Gulf Oil Corp. v. Mays, 401 Pa. 413, 164 A.2d 656 (1960). But cf. Parke, Davis & Co. v. Janel Sales Corp., supra. However, this last case is distinguishable, for the only question on appeal was whether Parke, Davis was a retailer. Moreover, there was no proof

of any competition between Parke, Davis and a retailer.

Thus, the question is one of contractual interpretation. Does this resale price maintenance contract provide for the establishment of resale prices between Lanvin and its competitors? Although in some cases this might call for a more elaborate factual inquiry, see Snap-On Tools Corp. v. F. T. C., 321 F.2d 825, 834–835 (7 Cir. 1963), in this case, assuming *arguendo* that Lanvin and plaintiffs are competitors, there is no doubt. First, there was no contractual limitation on the type of sales to which resale price maintenance was to apply. Lanvin could easily have contracted, for example, not to fix resale prices for bulk sales to businesses for their promotional campaigns. Of course, if Lanvin had done that, it would not have been able to enjoin Janel from selling at a discount to these concerns. Such contractual limitations are not uncommon. For example, in General Electric Co. v. Hess Brothers, Inc., supra, 155 F.Supp. at 62 n. 6, the court commented:

" * * * even if Plaintiff herein is considered to be in competition with defendant and other retailers for sales to the exempted groups, it has not required such competitors to meet minimum fair trade prices in sales to the exempted groups."

Accord Parke, Davis & Co. v. Rocket Drugs, Inc., 214 F.Supp. 937, 939 (S.D. N.Y.1963) (contractual exclusion of sales to hospitals, clinics, etc., from the minimum stipulated).

Furthermore, the State court has issued an injunction against plaintiffs. Lanvin Parfums, Inc. v. Carlton Drug, Inc., supra. Still assuming that plaintiffs and Lanvin are competitors, this action must have been based on an interpretation of the contract which allowed for the establishment of a resale

9. Of course, we do not refer to the maintenance of a stipulated price among retailers when such a resale price is based on a legal vertical contract between a retailer and a producer. We are here concerned only with the situation in which it is the producer who may actively compete with parties bound, by State law, to the stipulated price.

price between Lanvin and its competitors. See Port Chester Wine & Liquor Shop, Inc. v. Miller Bros. Fruiterers, Inc., 281 N.Y. 101, 22 N.E.2d 253 (1939). We are of course obligated to accept the State's interpretation of the contract.

Therefore, there is a question of fact—are Lanvin and plaintiffs in competition with each other? A determining factor might well be whether or not there may be a substantial number of customers who might buy from either. Of course, they are not competitors simply because they share a common customer. However, as the number of customers grows, the more probable it is that reasonable men might find that the supposed accommodation sales were a subterfuge and that the companies were in competition with each other. Furthermore, the fact that Lanvin has termed many of these sales "promotional" does not necessarily prevent them from being competitive sales. It is for the jury to look behind the labels. Lanvin is, of course, free to advertise and promote its own products as it wishes. But sales to Goldman Sachs & Co. for gifts at a dinner or sales to American Airlines for distribution in jet plane seats, both at 40% off the list price, are not solely for Lanvin's own promotional purposes. As these sales tend to benefit the purchaser's own promotional campaign, these buyers grow more willing to purchase the product from other available and competitive sources. Thus, they might become potential buyers from companies like the plaintiffs here. This is even more certain when these purchasers do business in plaintiffs' neighborhood. (E. g., Pop's Textiles).

As with the retailer issue, reasonable men may differ as to at what point Lanvin purchasers become probable customers of both Lanvin and plaintiffs. Moreover, reasonable men may also differ as to what volume of competitive sales will place Lanvin and plaintiffs in competition with each other. Therefore, the question—were Lanvin's sales "accommodation," "promotional" or competitive—would best be directed to the jury.

## IV.

Plaintiffs also contend that the "customer limitation" clause (clause (6)) was a *per se* violation of the Sherman Act § 1. They argue this position even though the jury gave a negative answer to the following question:

Did defendant Lanvin agree, combine, or conspire with Royal Drug Store or Hubert Drug Company, or both, that Lanvin products sold to Royal Drug Store or Hubert Drug Company would not be resold to plaintiffs Janel and Carlton?

In the first place, plaintiffs did not take proper objection to the charge as required by Fed.R.Civ.P. 51. The discussion of this question concluded with the following remarks:

"The Court: Well, Mr. Siegel, would you then, on the basis of what you tell me, say that the question properly to be submitted to the jury would be: Did defendant agree, combine, or conspire with Royal and Hubert that Lanvin products sold to Royal and Hubert would not be resold to plaintiffs?

"Mr. Siegel: I would say so, yes.

"The Court: You would say so?

"Mr. Siegel: Definitely."

In the second place, the existence of such a contractual clause does not necessarily imply a *per se* violation. In United States v. Arnold Schwinn & Co., 388 U.S. 365, 372, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1965), the Supreme Court premised its finding of a *per se* violation on the fact that Schwinn had been "firm and resolute" in insisting on compliance. Here, the evidence was conflicting on that issue. Plaintiffs' principal witness claimed that he was unable to buy Lanvin products from various retail stores; he claimed that the owners were afraid to sell to him, for if they did, they would lose the Lanvin line. Lanvin's witnesses contradicted this story. Moreover, Lanvin suggested that it never had, and

never enforced, a policy against diversion. Consistently with the rest of this decision, we believe that this type of question, with the proper guidance from the judge, is best settled by the jury.

On the whole, the trial judge's charge was proper here. He made it clear that the agreement need not be express or formal, that the contracting parties need not directly state their object and purpose and that although the question was stated in specifics, it was meant to ask whether or not direct accounts of Lanvin could not resell except to consumers. Since the jury answered the trial judge's question in the negative after this charge, plaintiffs' customer limitation argument is to no avail.

Reversed and remanded.