**M. J. KRUTSINGER, Plaintiff-Appellant,**

v.

**MEAD FOODS, INC., et al.,
Defendants-Appellees.**

**Nos. 76–1196, 76–1250.**

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted Oct. 14, 1976.

Decided Nov. 23, 1976.

As Amended Nov. 29, 1976.

Frank Gregory, of Chapel, Wilkinson, Riggs & Abney, Tulsa, Okl. (M. David Riggs, of Chapel, Wilkinson, Riggs & Abney, Tulsa, Okl., on the brief), for plaintiff-appellant.

Coleman H. Hayes, of Monnet, Hayes, Bullis, Thompson & Edwards, Oklahoma City, Okl. (Deane C. Watson, of Lumpkin, Watson, Barras & Reavis, Amarillo, Tex., on the brief), for defendant-appellee Mead Foods, Inc.

Before LEWIS, Chief Judge, and BREITENSTEIN and DOYLE, Circuit Judges.

DOYLE, Circuit Judge.

This case involves the question whether the defendant Mead Foods, Inc. was guilty of a violation of the Sherman Act, 15 U.S.C. Section 1, as a result of price maintenance arrangements.

Subsidiary questions are, first, whether under the law of Oklahoma there can be an oral agreement giving rise to immunity to

antitrust violations under the so-called Miller-Tydings Amendment to Section 1 of the Sherman Act. Second, whether, assuming that an oral contract is adequate, one existed in this case and the defendant-appellee Mead Foods, Inc., here referred to as Mead, is entitled under the exemption provision of the Miller-Tydings Act and the exception to that provision to enjoy an immunity under the Sherman Act exemption. Stated differently, is Mead denied the benefit of the exemption by virtue of its horizontal activity?

The plaintiff-appellant Krutsinger complains not only against Mead Foods, Inc. but also Rainbo Baking Company of Oklahoma City and ITT Continental Baking Company. The claims against the latter two defendants are not presently before us.

The evidence shows that plaintiff held positions in the bakery industry over some period of time. In February 1974, he purchased two trucks from Mead on credit and he then began to purchase and sell bread and other bakery products which were supplied by Mead. His distribution center was in southern Oklahoma City. The products were purchased for resale first in Norman, Oklahoma and the surrounding area, but he also sold bread to the general public at a store in Oklahoma City.

In August 1974, appellant commenced to solicit customers engaged in sandwich making and also restaurants in Oklahoma City. He was selling to these customers secondary label bread products which he had purchased from Mead. Theretofore they had been unable to purchase anything except the more expensive primary label products from bread makers. Primary label products are advertised extensively and they thus sell for a comparatively higher price. Notwithstanding this, the secondary label items may be essentially the same product. The willingness of appellant to sell the secondary label products to sellers in the retail trade provided to plaintiff a price advantage over his competitors. Plaintiff maintains in this regard that even if he had a contract with Mead to maintain prices of primary and secondary label items, there was no agreement to refrain from selling secondary label products to the Oklahoma City trade. The appellant had no sooner invaded the wholesale market in Oklahoma City than retaliatory action was taken against Mead by Rainbo in Lawton. Rainbo started cutting prices there which is Mead's principal market. As a result, according to appellant's contention at least, Mead began to pressure him to discontinue the sale of secondary label products to certain customers in Oklahoma City. He refused to do so and thereafter Mead terminated all sales to him. According to his further allegations, all of the defendants refused to sell him bread products for resale.[1]

Appellant first moved for summary judgment on April 16, 1975, and this motion was limited to the existence of an unlawful vertical combination or conspiracy contrary to Section 1 of the Sherman Act. Defendant Mead moved for summary judgment on its part contending the legality of the price fixing agreement. At first the district court overruled the motions for partial summary judgment, but did so without prejudice. Some months later, on January 20, 1976, the motion was sustained and the judge signed an order prepared and presented by the defendant.

The essence of the court's judgment was dismissal of the part of the complaint which set forth the claim based upon illegal vertical restraint of trade against all of the defendants. The reason for dismissing against Rainbo and Continental was that these two companies did not have any contractual relationship with the plaintiff, vertical or otherwise. Since they had no vertical price maintenance agreements with appellant, there could be no recovery against them on any vertical price control theory. The court said that the allegation of conspiracy with respect to the vertical restraint of trade was not effective to spell out a cause of action as to Rainbo and Continental. Unfair price setting with respect to

---

1. Mead claims that the refusal to sell was attributable to failure of appellant to pay his bill.

wholesale prices would constitute a horizontal unfair trade practice rather than a vertical one.

The trial court also held that Mead could rely upon the Oklahoma Fair Trade Act[2] as a defense to Section 1 of the Sherman Act charge; that it authorizes retail price maintenance which would ordinarily be contrary to the Sherman Act. However, Congress had authorized such state action in the Miller-Tydings Amendment to Section 1 of the Sherman Act, 15 U.S.C., plus the McGuire Act, 15 U.S.C. Section 45(a)(2)–(5). The court went on to hold that the agreement between appellant and Mead was specifically covered by the Oklahoma Fair Trade Act. The trial court did not consider significant the fact that Mead might have competed against plaintiff on the same functional level. In other words, this did not cause Mead to lose the protection afforded by the Oklahoma Fair Trade Act. This conclusion was held to follow from the fact that appellant was a wholesaler operating a commercial restaurant route in Oklahoma City, whereas Mead did not operate any company-run bread route nor did it engage in any wholesale operation in Oklahoma City and thus did not compete with appellant on the same quantitative or qualitative level within the

requirement of *United States v. McKesson & Robbins,* 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956).

## I.

Prior to the 1937 amendment to Section 1 of the Sherman Act, which amendment is called the Miller-Tydings Act, the maintaining of minimum resale prices was held to be unlawful as being in clear violation of the Sherman Act, Section 1. This was established in *Dr. Miles Medical Co. v. John D. Park & Sons,* 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911). It was within the power of the state, however, to authorize vertical price maintenance as it saw fit to do so provided it was limited to commodities moving in intrastate commerce. In 1937, Congress passed the Miller-Tydings Act amending Section 1 of the Sherman Act.[3] This amendment expressly exempted minimum resale price contracts from the Sherman Act in interstate commerce. However, in order for such contracts to enjoy the exemption from the prohibitions of the Sherman Act and the Federal Trade Commission Act they had to be authorized under state law. The purpose of this was, of course, to eliminate such unfair trade practices as cutthroat competition. The federal

2. The repeal of the Oklahoma Fair Trade Act, 78 Okl.St. 1971, Sections 41, 42, as amended, was approved by the Oklahoma Legislature on May 24, 1976. This legislative action, of course, has no effect on this lawsuit.

3. The Sherman Act as amended by the Miller-Tydings Act reads as follows:

Section 1.

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: *Provided,* That nothing contained in sections 1 to 7 of this title shall render illegal, contracts or agreements prescribing minimum prices for the resale of a commodity which bears, or the label or container of which bears, the trademark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others, when contracts or agreements of that description are lawful as applied to intrastate transactions, under any statute, law, or public policy now or hereafter in effect in any State, Terri-

tory, or the District of Columbia in which such resale is to be made, or to which the commodity is to be transported for such resale, and the making of such contracts or agreements shall not be an unfair method of competition under Section 45 of this title: *Provided further,* That the preceding proviso shall not make lawful any contract or agreement, providing for the establishment or maintenance of minimum resale prices on any commodity herein involved, between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms, or corporations in competition with each other. Every person who shall make any contract or engage in any combination or conspiracy declared by sections 1 to 7 of this title to be illegal shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

legislation sought to validate this kind of activity which would have been unlawful under federal law. In 1951, the Supreme Court in the case of *Schwegmann Bros. v. Calvert Distillers Corp.,* 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035 (1951), held that the Miller-Tydings Act did not extend to those persons who had not entered into such contracts. As a result of this decision, Congress passed the McGuire Act, 15 U.S.C. Section 45(a)(2)–(5). This latter measure amended the FTC Act and thereby authorized imposition of minimum or stipulated resale prices contained in valid state fair trade contracts on "non-signers." [4]

The Miller-Tydings Amendment shown above is tacked to Section 1 of the Sherman Act and as written it confers an immunity from antitrust law violation. This was in the form of the "provided" clause which immediately follows the Sherman Act statute reported above. It contemplates minimum price agreements and provides that they are not invalid even though ordinarily they would violate the Sherman Act. It also contemplates that the manufacturer or wholesaler attempting to protect its good will can enter into such a contract with a retailer, for example. This same Miller-Tydings Act has a "provided further" clause, however, which limits the scope of such vertical arrangements and excludes from antitrust exemption agreements between competitors and persons in the same line of commerce.

## II.

■ Must a Miller-Tydings-Fair Trade Act price maintenance contract be a formal written agreement under the law of Oklahoma? Appellant says that it does. Mead Foods contends, of course, that it can be oral as it apparently was in this case. No Oklahoma case deals with the issue one way or the other. Appellant's reliance on the Oklahoma decision in *American Home Products Corp. v. Homsey,* 361 P.2d 297 (Sup.Ct.Okl.1951), is misplaced. The court in that case struck down an Oklahoma provision allowing non-signers to be held to fair trade agreements. Appellant contends that this evidences that Oklahoma requires a formal contract. We disagree. The *American Home Products* problem was different and lends no support.

There are few cases from other courts dealing with this question. The Supreme Court of Wisconsin considered it in the context of a non-signer case in *Mogen David Wine Corp. v. Borenstein,* 267 Wis. 503, 66 N.W.2d 157 (1954). The Supreme Court of Rhode Island case of *General Electric Company v. Fain,* 83 R.I. 426, 118 A.2d 342 (1955), is of a similar nature. Neither decision is authoritative in relation to these facts.

Appellant also points to Lenox, Inc., 73 F.T.C. 578, 602 (1968), *aff'd as modified sub nom. Lenox, Inc. v. F.T.C.,* 417 F.2d 126 (2d Cir. 1969), where it was held that the evidence was insufficient to establish a contract, but the court here would have recognized an oral agreement which had evidentiary support. Other cases hold that the existence of a written formal agreement is unnecessary. *See Downs v. Benatar's Cut Rate Drug Store,* 75 Cal.App.2d 61, 170 P.2d 88 (1st Dist., 1946), and *United States v. Socony Mobil Oil Co.,* 150 F.Supp. 202 (D.Mass.1957), *certified,* 252 F.2d 420 (1st Cir.), *dismissed,* 356 U.S. 925, 78 S.Ct. 712, 2 L.Ed.2d 757 (1958).

The state of the law both in Oklahoma and nationally is far from definitive. Since the question calls for construction of the Oklahoma Fair Trade statute, we believe that the best solution is to certify to the Supreme Court of Oklahoma the question whether the instant type of contract made pursuant to the Miller-Tydings Act and the Oklahoma Fair Trade law must be formal and in writing in order to be valid and effective. The Uniform Certification of Questions of Law Act is in force in Oklaho-

---

4. It is noteworthy that the Miller-Tydings and the McGuire Acts were repealed by the enactment of the Consumer Goods Pricing Act of 1975, Public Law 94–145, 89 Stat. 801, approved December 12, 1975, and effective March 11, 1976. *See* 12 U.S.Code Cong. & Admin. News 3313 (1975). This legislation, however, does not affect the instant case.

ma. 20 O.S. Sections 1601, et seq. Accordingly, we shall prepare an interrogatory under this section and submit it together with the record and briefs in the case.

### III.

■ Our second question is whether the defendant Mead is precluded from claiming the protection of the antitrust exemption (see the part under "provided", footnote 3) above considered by reason of its having operated as a wholesaler. In other words, do the provisions contained in the further proviso part of the amendment come into play so as to remove Mead from the scope of the exemption. The argument is that Mead is a manufacturer-wholesaler who is dealing with a wholesaler and thus it is a contract between wholesalers.

In order to qualify for an exemption from the antitrust liability the resale price fixing agreements must satisfy the conditions in the Miller-Tydings and McGuire Acts. *United States v. McKesson and Robbins, Inc.,* 351 U.S. 305, 310, 76 S.Ct. 937, 100 L.Ed. 1209 (1956). In the *McKesson* case the Supreme Court explained that: "Congress has marked the limitations beyond which price fixing cannot go. We are not only bound by those limitations but we are bound to construe them strictly, since resale price maintenance is a privilege restrictive of a free economy." *Id.* at 316, 76 S.Ct. at 943.

The *McKesson* Court construed this second proviso of the Miller-Tydings Act which in turn qualifies the antitrust exemption so as not to include competitors. The relevant provision of the Act states that the exemption "shall not make lawful any contract or agreement providing for the establishment or maintenance of minimum resale prices on any commodity herein involved between manufacturers or between * * * wholesalers * * * or between persons, firms, or corporations in competition with each other." This latter clause, as we view it, gives meaning to the exception to the exemption. It is intended to exclude from the exemption contracting parties who are in competition with one

another and it specifies various businesses which cannot be regarded as having a vertical relationship with each other.

Appellant argues with some force and reason that his minimum resale price agreement with Mead is not exempted from antitrust liability because it falls within the second proviso mentioned above which excludes contracts "between wholesalers . . . or between persons, firms, or corporations in competition with each other." He further argues that the district court erred in concluding that Mead did not compete with the plaintiff on the same functional level.

Based upon a review of the entire record and upon a consideration of the relationship between these parties, we are of the opinion that Mead falls within the terms of the second proviso of the Miller-Tydings Act and that it does not qualify for the antitrust exemption given in the first proviso. Accordingly, the district court erred in resolving those issues against the plaintiff.

The Court in *McKesson* held the crucial issue relative to the second proviso of the Miller-Tydings Act to be whether the contracting parties were in competition. 351 U.S. at 313, 76 S.Ct. 937. In that case the relationship was the same as that which we have in our case. There were resale price maintenance contracts between a manufacturer-wholesaler and independent wholesalers. The manufacturer-wholesaler maintained in that case that it was not precluded from claiming entitlement to the exemption. Its reason was that it was more than merely a wholesaler. The Court did not accept this argument. It relied on the phrase "or between persons, firms, or corporations in competition with each other," as giving character to the entire proviso. It concluded that the second proviso "excludes from the exemption . . . resale price maintenance contracts between firms competing on the same functional level." *Id.* at 315, 76 S.Ct. at 943.

The cases since *McKesson,* such as *Janel Sales Corp. v. Lanvin Parfums, Inc.,* 2 Cir., 396 F.2d 398 (1968), have given added attention to the second proviso. The court in

*Janel Sales* had before it paragraph 5 of the McGuire Act which it said is virtually the same as the second proviso of the Miller-Tydings Act. It held that "if two retailers sign a price maintenance contract, regardless of whether they are competitors, then the contract is within paragraph (5) and, therefore, excluded from McGuire Act immunization from the Sherman Act." *Id.* at 403. The fact that *Janel Sales* was construing the McGuire Act does not detract from its holding as to the closely similar provisions of the Miller-Tydings Act. From a reading then of *McKesson* and *Janel Sales,* it is to be concluded in our case that the Miller-Tydings second proviso eliminates protection which would otherwise be afforded by the antitrust exemption. *See Ar-Ex Products Co. v. Capital Vitamin & Cosmetics Corp.,* 351 F.2d 938, 940 (1st Cir. 1965); *Esso Standard Oil Co. v. Secatore's, Inc.,* 246 F.2d 17 (1st Cir.), *cert. denied,* 355 U.S. 834, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957).

There is another viewpoint expressed in some cases that actual competition at the same functional level is the sole factor determinative of whether a firm can avail itself of the relevant exemption. Mead emphasizes that *McKesson* says this is the crucial inquiry. *See* 351 U.S. at 313, 76 S.Ct. 937. But one cannot look at this language and at the same time overlook the statements in *McKesson* finding it unnecessary to consider whether the existence of a contract between wholesalers by itself serves to disqualify a firm from asserting the exemption and placing the emphasis on the last clause dealing with competition with each other. Mead also relies on *G.E.M. Sundries Co. v. Johnson & Johnson, Inc.,* 283 F.2d 86 (9th Cir. 1960), as a case which holds that competition at the same functional level is the sole determinant of disqualification for the exemption. The *Johnson & Johnson* decision does emphasize the competition test. But the *Johnson & Johnson* facts serve to differentiate it from our case so that in the present context it does not favor Mead's position. Johnson & Johnson was a manufacturer-wholesaler and G.E.M. Sundries was a retailer. But the court found only that there was a lack

of actual competition between the two parties. It could also have said that there was neither a wholesaler-wholesaler relationship nor a retailer-retailer relationship between the two of them.

Also cited by Mead is the case of *The Upjohn Co. v. Charles Labs, Inc.,* 277 F.Supp. 445 (S.D.N.Y.1967), which was concerned with enforcement of a minimum resale price contract against a nonsigning party. It was there noted that the test for disqualification under the McGuire Act, paragraph 5, was whether persons, firms, or corporations were in competition with each other and the court said that the relevant competition existed when two or more business enterprises solicit business from and direct sales to the same general class of customer. In the *Upjohn* case there was a lack of competition between the defendant-retailer and Upjohn, which sold to wholesalers, retail drug stores, hospitals, physicians and industrial clinics. The court said that the sales to hospitals and clinics did not constitute retail sales which were competitive with sales that retail drug stores make. Thus, aside from finding an absence of competition between Upjohn and the defendant, it also implicitly found that no retailer-retailer relationship existed.

In sum, it can be said that all of the cases including those provided us by Mead recognize that in order for a party to claim the exemption it must not appear that the parties are functioning at the same trade level or are competing in any relationship not specifically mentioned in the statute. The clause "in competition with each other," which is the language in the second proviso of the Miller-Tydings Act, gives character to the specific relationships which are set forth in the statute. It follows then that the trial court's conclusion that Mead was not engaged in wholesale business in Oklahoma City was not supported by the record since Mead sold approximately $2,000 per month of bread products to a retail establishment, Dolly Madison, for resale to the public. The district court's distinction that these were not part of a company-run bread "route" does not stand up. The point is

that this was a wholesale operation within the relevant market, Oklahoma City. There is no genuine distinction between sales to customers who use bread to make sandwiches for consumption in a restaurant or "take-out" and customers who sell packaged bread in a bakery shop. Mead's potential to serve customers who resell bread is amply demonstrated by its trade with Dolly Madison.

At the very least, then, there is an issue of material fact to be tried as to the existence of a wholesaler-wholesaler relationship here or the presence of competition, actual or potential. It is true that Mead's principal operation as a manufacturer-wholesaler is in the Lawton, Oklahoma area. It is also true that appellant's former business was largely carried on in the Norman area but he also had customers in Oklahoma City at the same time that Mead discontinued sales to him. It cannot be denied that if the Oklahoma City area is the relevant market that the presence of wholesale sales by both parties within this market area brings the case within the second proviso of the Miller-Tydings Act.

The remaining question is what is the geographic scope of the market.[5] Does business carried on in Oklahoma City relate to activities in Lawton and Norman? This court is unable to judicially notice this because it is more than simple geography. It is interaction between a city and its surrounding areas. It calls for evidence and findings.

The judgment of the district court is affirmed in part and reversed in part and is remanded for further proceedings consistent with the views expressed herein.

The trial court must abide by any response which the Supreme Court of Oklahoma provides in answer to the interrogatory submitted to it.

The clerk of this court shall certify this court's interrogatory to the Supreme Court of Oklahoma pursuant to the Uniform Certification of Questions of Law Act, 20 O.S. Sections 1601 et seq.

---

5. *See Ar-Ex Products Co., supra,* at 939–40 ("a manufacturer is 'in competition' with retailers if he holds himself out as selling his products to consumers *in the same market* in retail quantities") (emphasis supplied).